# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **DORETHA HARRELL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-55-JJB-RLB** |
| **CAROLYN W. COLVIN,**<br>**COMMISSIONER OF**<br>**THE SOCIAL SECURITY**<br>**ADMINISTRATION** | |

## <u>NOTICE</u>

Please take note that the attached Magistrate Judge's Report and Recommendation has been filed with the Clerk of the U.S. District Court for the Middle District of Louisiana.

Under 28 U.S.C. § 636(b)(1), you have **14 days** from receipt of this Notice to file written objections to the findings of fact and conclusions of law recommended by the Magistrate Judge. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME WILL BE GRANTED TO FILE OBJECTIONS TO THE REPORT AND RECOMMENDATION.**

Signed in Baton Rouge, Louisiana, on February 13, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

DORETHA HARRELL                                          CIVIL ACTION


VERSUS                                                   NO. 14-55-JJB-RLB

CAROLYN W. COLVIN,
COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff, Doretha Harrell (Plaintiff), seeks judicial review of an unfavorable decision of

the Commissioner of the Social Security Administration (Commissioner), pursuant to 42 U.S.C.

§ 405(g).  Plaintiff appeals the Commissioner's denial of her application for disability insurance

benefits "under Title II and part A of Title XVIII of the Social Security Act" (Tr. 170-71).[1]  For

the reasons given below, the Court recommends that the Commissioner's decision be

**AFFIRMED** and Plaintiff's appeal be **DISMISSED with prejudice**.

I.      **PROCEDURAL HISTORY**

On September 30, 2008, Plaintiff filed two applications for benefits — one for

supplemental security income (SSI) (Tr. 177-80); and another for disability insurance benefits

(DIB) (Tr. 170-71), which is the subject of the current appeal.   Both applications originally

alleged an onset date of April 2, 2002. (Tr. 170, 177).  The applications were initially denied and

Plaintiff filed a timely request for a hearing that was held on January 14, 2010. (Tr. 32-36).  No

testimony was taken at the hearing. (Tr. 32-36).  Instead, Plaintiff's attorney successfully

---

[1] References to documents filed in this case are designated by: (R. Doc. [docket entry number(s)] at [page number(s)]).  References to the record of administrative proceedings filed in this case are designated by: (Tr. [page number(s)]).

requested that the April 2, 2002 onset date (alleged in both applications) be amended to September 30, 2008. (Tr. 34, 72). Before going on the record, the ALJ held "an informal" conference with Plaintiff's counsel where the ALJ "proposed a favorable decision with respect to Ms. Harrell's application for Supplemental Security Income . . . and withdrawal of the claim for Title II [(DIB)] benefits, based on an expired date last insured of March 31, 2007." (Tr. 34). After discussing the proposal with her attorney, Plaintiff agreed (Tr. 35-35). The ALJ issued a decision on March 4, 2010. (Tr. 71-76). The ALJ found Plaintiff became disabled on September 23, 2008 and was entitled to SSI benefits. (Tr. 72). Consistent with the hearing, the ALJ dismissed Plaintiff's Title II (DIB) application. (Tr. 72) ("On the basis of a prehearing conference . . . it was agreed that the onset date would be amended to [September 30, 2008]. . . . [and] that the application for Title II benefits would be withdrawn based on a date last insured of March 31, 2007.").

On January 20, 2010, before the ALJ issued his decision, Plaintiff's attorney wrote to the ALJ. (Tr. 188). The letter explained that Plaintiff was now suffering from cancer and that in light of this:

> Ms. Harrell has advised that she would like Your Honor to consider allowing her to prove her claim for Disability Insurance benefits with the date last insured of March 31, 2007, and therefore withdraws her consent to the onset date of September 30, 2008 – the date of the filing of the application for Supplemental Security Income.
>
> At this point, I will ask that Your Honor hold the record open thirty days to allow me to medically develop the issue of pre-date last insured disability and brief same as well.

(Tr. 188). The ALJ's March 4, 2010 decision, however, did not mention counsel's letter or Plaintiff's request for consideration of her DIB application. And so, Plaintiff appealed the ALJ's dismissal of her DIB application to the Appeals Council on April 6, 2010. (Tr. Tr. 121-23).

The Appeals Council issued an order on August 22, 2011. (Tr. 77). The order granted Plaintiff's request for review, vacated the ALJ's order dismissing Plaintiff's DIB application, and remanded the case to the ALJ for further proceedings. (Tr. 77-80).[2] On remand, the Appeals Council instructed that the ALJ "may take any further action needed to complete the administrative record and issue a new decision based on the claimant's application for title II [benefits] . . . and the issue of disability on and before March 31, 2007, the claimant's date last insured." (Tr. 79).

Following remand, a new hearing was held before a different ALJ on September 5, 2012. (Tr. 37-64). Plaintiff, represented by counsel, appeared and testified. (Tr. 42-59). Dr. Richard Galloway, a vocational expert (VE), also provided testimony. (Tr. 60-63).

Following the hearing, the ALJ issued an unfavorable decision on September 21, 2012. (Tr. 19-27). The ALJ found Plaintiff had not been under a disability from the alleged onset date of April 2, 2002 through March 31, 2007, the date last insured. (Tr. 20). Plaintiff's request for review was denied by the Appeals Council on September 4, 2013. (Tr. 4-6). The ALJ's decision rested as the final decision when the Appeals Council denied Plaintiff's request for review. *See* 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you . . . file an action in Federal district court . . . ."). The ALJ's final decision denying Plaintiff's application for DIB benefits is now ripe for review under 42 U.S.C. § 405(g).

## II.     STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct

---

[2] In that same order, the Appeals Council affirmed the ALJ's finding that Plaintiff was disabled as of September 23, 2008 and the ALJ's decision to grant Plaintiff's SSI benefits. (Tr. 79). Plaintiff's SSI application and her disability beginning September 23, 2008 is not at issue before the Court.

legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" in the context of the National Labor Relations Act, 29 U.S.C. § 160(e)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quotations omitted). Conflicts in the evidence are for the Commissioner "and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision. *See, e.g.*, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994) ("This is so because substantial evidence is less than a preponderance but more than a scintilla."); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) ("we must carefully scrutinize the record to determine if, in fact, such evidence is present; at the same time, however, we may neither reweigh the evidence in the record nor substitute our judgment for the Secretary's"); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (same).

If the Commissioner's decision is supported by substantial evidence, then it is conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000). If the Commissioner fails to apply the correct legal standards, or fails to provide a reviewing court with

a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

## III.    ALJ'S DETERMINATION

In determining disability, the Commissioner, through the ALJ, works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4).  The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability.  If the claimant is successful in sustaining his or her burden at each of the first four steps, the burden shifts to the Commissioner at step five. *See Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (explaining the five-step process).  First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  Second, the claimant must prove his or her impairment is "severe" in that it "significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c).  At step three the ALJ must conclude the claimant is disabled if he proves that his or her impairments meet or are medically equivalent to one of the impairments contained in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(d) (step three of sequential process); 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of Impairments).  Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his or her past relevant work.  20 C.F.R. § 404.1520(f).

If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he or she is capable of performing other work.  20 C.F.R § 404.1520(g)(1).  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, the ALJ issued an unfavorable decision based on the evidence contained in the administrative record relevant to the period between April 2, 2002 (the alleged onset date) and March 31, 2007 (the date last insured). Specifically, the ALJ found that between April 2, 2002 and March 31, 2007:

1. Plaintiff met the insured status requirements of the Act through March 31, 2007.

2. Plaintiff did not engage in substantial gainful activity between April 2, 2002 (the alleged onset date) and March 31, 2007 (the date last insured).

3. Plaintiff suffered from the following severe impairments: left knee problems, lymphedema, obesity and diabetes mellitus.

4. Plaintiff did not have an impairment(s) that met or medically equaled the severity of a Listing(s)—specifically Listing 1.00 (Musculoskeletal) and Listing 7.00 (Lymphedema).

5. Plaintiff had the residual functional capacity to perform the full range of sedentary work.

6. Plaintiff was unable to perform any past relevant work.

7. Plaintiff was a younger individual between the ages of 18 and 44 at the relevant time.

8. Plaintiff had a high school education and could communicate in English.

9. The transferability of Plaintiff's job skills was not material to the ultimate determination because the Medical Vocational Guidelines (GRIDS) directed a finding of disabled.

10. Given Plaintiff's age, education, work experience and RFC, Rule 201.28 of the GRIDS directed a finding of not disabled as jobs existed in the national economy that Plaintiff could perform.

(Tr. 22-27).

## IV.    DISCUSSION

Plaintiff raises the following assignments of error on appeal. First, Plaintiff suggests the ALJ erred by failing to "address the medical opinion evidence of the Plaintiff's treating

physician and the state agency consultants to properly support his RFC." (R. Doc. 10 at 6-10).

The ALJ's "failure to acknowledge the medical opinion evidence" further calls into question the

RFC assessment, which fails to incorporate any manipulative limitations resulting from

Plaintiff's impaired left arm. (R. Doc. 10 at 8-9). Finally, Plaintiff argues the "ALJ erred in his

failure to fully consider the plaintiff's obesity and its combined effect with plaintiffs [sic] other

severe impairments." (R. Doc. 10 at 10).[3]

### A.    Consideration of Opinion Evidence and RFC Assessment

Plaintiff argues the ALJ's RFC finding is legally deficient because it does not adequately

discuss the September 14, 2012 medical source statement (MSS) of Dr. Richard Rathbone, one

of Plaintiff's treating physicians, or the opinion of the examining and non-examining state

agency consultants.

Generally, the "opinion of the treating physician who is familiar with the claimant's

impairments, treatments and responses, should be accorded great weight in determining

disability." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. §

404.1527(c)(1) (examining physician opinion given more weight than non-examining physician).

"Absent reliable medical evidence from a treating or examining physician controverting the

claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the

ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in

---

[3] Although not an assignment of error, Plaintiff briefly mentions that the ALJ erred by not acknowledging in his decision that Plaintiff amended her April 2, 2002 onset date to April 20, 2005 at the hearing. (R. Doc. 10 at 9); (Tr. 41) (amending onset date to April 20, 2005 to avoid any res judicata issues that may arise given an earlier, unrelated application that was denied on April 29, 2005). According to Plaintiff, the "period the ALJ should properly have considered for this decision was that from April 30, 2005 through September 23, 2008." (R. Doc. 10 at 9). Plaintiff's argument, however, is legally deficient. An applicant seeking Title II benefits must establish disability at any time on or before the date last insured. SSR 83-20, 1983 WL 31249 (Jan. 1, 1983). Here, the beginning point of that consideration by the ALJ, (April 2, 2002) was actually earlier that it needed to be (April 30, 2005). But this is immaterial because the period considered by the ALJ (April 2, 2002 to March 31, 2007) encompassed the period alleged by Plaintiff (April 30, 2005 to March 31, 2007). The decision makes clear that the ALJ considered all of the available evidence dated on or before March 31, 2007. And so, any error by the ALJ was harmless as the period alleged by Plaintiff was no doubt considered.

20 C.F.R. § 404.1527(d)(2)." *Newton*, 209 F.3d at 453.[4]  However, the ALJ is not required to

consider each of the six factors set out in *Newton* when "there is competing first-hand medical

evidence . . . ." *Walker v. Barnhart*, 158 F. App'x. 534, 535 (5th Cir. 2005) (quoting *Newton*,

209 F.3d at 458).  When the record contains medical evidence from multiple treating sources, the

ALJ is "not required to go through all six steps in *Newton*" because "the ALJ is responsible for

resolving conflicts in the evidence, and we will not substitute our judgment for his." *Cain v.*

*Barnhart*, 193 F. App'x. 357, 360 (5th Cir. 2006) (citing *Newton*, 209 F.3d at 452, 458; *Walker*,

158 F. App'x. at 534).

The Court agrees with Plaintiff that the ALJ did not perform the "detailed analysis" of

section 404.1527(d)(2) criteria contemplated by *Newton* or assign any specific weight to Dr.

Rathbone's opinion in his medical source statement.  The Court, however, does not agree that the

ALJ's analysis constitutes reversible error.

First, the record contains "competing first-hand medical evidence" from multiple other

treating physicians, including Dr. Brian Kozar (Tr. 252-61), Dr. David McGraw (275-310), and

doctors at LSU's Lallie Kemp Medical Center (Tr. 311-459). *Walker*, 158 F. App'x at 535.  In

this case, *Newton* does not apply and the ALJ was not required to analyze the § 404.1527 factors.

Second, any error in the ALJ's failure to assign a particular weight to Dr. Rathbone's

opinion was harmless because Plaintiff cannot show that it affected her substantial rights. *Mays*

*v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative

proceedings is not required" and remand will not be warranted "unless the substantial rights of a

party have been affected.").  A medical source statement from a treating physician must be based

---

[4] Those criteria provide that the ALJ consider: (1) the length of the treatment relationship and frequency of
examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the
opinion; (4) consistency of the treating physician's opinion with the record as a whole; (5) whether the opinion is
that of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2).

on the physician's personal knowledge and medical findings resulting from his or her treatment of the claimant. *See* SSR 96-5P, 1996 WL 374183, at *4 (July 2, 1996). Dr. Rathbone's MSS is not based on his own subjective knowledge of Plaintiff's conditions and is otherwise inconsistent with the record during the relevant time.

First, Dr. Rathbone suggests Plaintiff suffered from severe limitations that are not corroborated by his own treatment records. In his MSS, Dr. Rathbone advises that Plaintiff could only stand or walk for up to one hour, and sit for up to 2 hours, in an 8-hour workday. (Tr. 651). She could stoop for up to 5% of the workday (or 24 minutes) and was limited to lifting less than 10 pounds frequently and no more than 10 pounds occasionally. (Tr. 651-52). Her right upper extremity could perform fine and gross manipulation without difficulty. (Tr. 652). However, Dr. Rathbone limited Plaintiff's use of her left upper extremity for fine or gross manipulation to "none to very little" (or 0 to 24 minutes) in an 8-hour workday. (Tr. 653). Plaintiff could not maintain full-time employment, in Dr. Rathbone's opinion, because her impairments would cause her to miss work 2 to 3 days per month. (Tr. 653). Finally, Dr. Rathbone advised that his "opinion as to functional limitations [was] appropriate since onset of treatment and certainly *since* March 31, 2007," based on the following "diagnoses" and "positive clinical (examination)" signs:

> Sarcoidosis – status/post removal of lymph nodes in left axilla. Now marked lymphedema of left upper extremity. Left upper extremity is swell 3 times normal [size]. Degenerative arthritis to left knee.

(Tr. 653).

Dr. Rathbone treated Plaintiff for 2 years, beginning on June 13, 2005 after she slipped and fell, injuring her left knee. (Tr. 263-72). Dr. Rathbone's treatment records show that he never treated Plaintiff for sarcoidosis, lymphedema, or any other impairment associated with her

left upper extremity — the impairments upon which his MSS and Plaintiff's disability application are predominately based.

On her initial June 13, 2005 evaluation, Dr. Rathbone reported that Plaintiff complained of left knee, lower back and right index finger pain after falling on May 31, 2005. (Tr. 270). X-rays taken of the lower back, left knee, left ankle, and right hand on June 13, 2005 were all "negative." (Tr. 271-72). A September 27, 2005 MRI of her left knee showed "tears of the lateral and medial menisci." (Tr. 261, 267).[5] Dr. Rathbone treated Plaintiff's complaints of left knee pain with injections beginning in 2005, which she reported as helpful in alleviating her symptoms. (Tr. 264, 266-69). Dr. Rathbone only examined Plaintiff twice in 2006 to administer injections. (Tr. 265). Plaintiff then waited almost a year before again seeing Dr. Rathbone on March 22, 2007 to request an injection for alleged left knee pain. (Tr. 265). By May 31, 2007, Plaintiff reported that her "knee [was] feeling much better." (Tr. 264). Plaintiff's last appointment with Dr. Rathbone occurred on August 7, 2007. (Tr. 263). Identical to his earlier records, Dr. Rathbone's notes from that exam simply relay Plaintiff's subjective allegations of pain and report that she was "[t]here for a left knee injection," which she was given along with a refill of Lortab. (Tr. 263).

It is clear that Dr. Rathbone's treatment of Plaintiff overwhelmingly focused on her left knee. Even still, Dr. Rathbone explained on September 14, 2012 that his MSS was based on Plaintiff's sarcoidosis and lymphedema. (Tr. 653). But throughout his treatment, Plaintiff did not once complain of symptoms associated with sarcoidosis or lymphedema of her left upper extremity. Dr. Rathbone never observed swelling, decreased range of motion or weakness of Plaintiff's left upper extremity, which might corroborate his opinion that Plaintiff was

---

[5] As the ALJ pointed out, Plaintiff was referred to Dr. Brian Kozar in December of 2005. (Tr. 24). And while Dr. Kozar suggested Plaintiff was a "candidate for elective left knee arthroscopy," surgery was never performed because Plaintiff was considered too young. (Tr. 48, 257).

completely unable to use her left arm and hand between 2005 and 2007. However, this makes sense considering the contemporaneous record evidence otherwise shows Plaintiff was last treated for lymphedema in March 2002 by another doctor at Lallie Kemp (Tr. 458); and Plaintiff's sarcoidosis last required steroid treatments in 2003 and was "inactive" as of November 11, 2005. (Tr. 305, 601).

Beyond that, while Dr. Rathbone did treat Plaintiff for impairments associated with her left lower extremity, his exam notes do not show that he performed regular testing of Plaintiff's range of motion in any extremity or joint, including her left leg and knee. There are no reports of impaired gait, atrophy, or weakness in either lower extremity. He likewise never advised Plaintiff to limit her activities in any way. Nonetheless, Dr. Rathbone found that Plaintiff could not stand or walk for more than 1 hour during the adjudicated period.

For a medical source statement to be credited, it must be based on the treating physician's personal knowledge and medical findings that result from his or her treatment of the claimant. *See* SSR 96-5P, 1996 WL 374183, at *4. Dr. Rathbone's statement is not based on his own treatment of Plaintiff. Instead, it simply mirrors Plaintiff's hearing testimony about limitations associated with her left upper extremity, which the ALJ appropriately discredited as inconsistent with the overall record.

At the hearing, Plaintiff claimed that she was diagnosed with lymphedema in 2002 after she underwent surgery in 2000. (Tr. 46). According to Plaintiff, her arm became so swollen in 2002 that "couldn't bear it anymore." (Tr. 46). She "couldn't type," she "couldn't do anything," and had to stop working. (Tr. 46). Beginning in 2001 or 2002, she could not lift her left arm. (Tr. 55). From 2005 through 2007, she was unable to lift her left arm to the side or straight out in front of her. (Tr. 55). Her lymphedema also prevented her from maintaining a grip on objects

with her left hand — she had no strength in her left hand or arm. (Tr. 55). Plaintiff explained that her entire left arm, including her fingers, swelled on a daily basis between 2005 and 2007. (Tr. 56). To decrease the swelling, Plaintiff claims doctors instructed her to elevate the arm above the heart for at least 2 hours each day. (Tr. 56-57). Her lymphedema also required her to use a compression pump twice a day for 40 minutes at a time, according to Plaintiff. (Tr. 58-59). By 2007, Plaintiff testified that doctors instructed her to use her compression pump 3 instead of 2 times each day. (Tr. 59).

The symptoms and treatment described by Plaintiff, however, are belied by the record evidence. Plaintiff received continuous treatment between 2005 and 2007, but none of her medical records indicate that she suffered from lymphedema between 2002 and 2008.

Plaintiff was first treated for lymphedema at Lallie Kemp on March 13, 2002. (Tr. 457-58). At that time, doctors observed edema (swelling) of the left upper extremity, but noted that her upper extremity strength was equal bilaterally and there were no signs of decreased sensation. (Tr. 457). Plaintiff was instructed to elevate her left arm, wear a stockinette on her upper left arm and to continue taking Tylenol for pain. (Tr. 458). Beyond that, Plaintiff's consistent stream of treatment records from Lallie Kemp Medical Center report "no edema" beginning on March 19, 2003. (Tr. 427, 423-24, 418, 414, 404, 406-07, 403, 398, 393, 380, 361, 348-50, 320). In addition to "no edema," Plaintiff exhibited full range of motion on June 18, 2003. (Tr. 423-24). Doctors additionally instructed her to walk for 30 minutes "at least" 4 times a day. (Tr. 424). On April 25, 2004, Plaintiff complained of pain in her lower extremity and reported that she was "usually very active and pain is making it difficult to get around." (Tr. 406). However, doctors observed no weakness and advised her to engage in activities as normal. (Tr. 408). Exam notes from October 20, 2004 note full range of motion in all extremities except

for the right knee. (Tr. 393). Treatment records from March 23, 2005 and June 22, 2005 likewise do not indicate findings of edema, despite Plaintiff's testimony that she experienced daily swelling beginning in 2002. (Tr. 361, 380). Plaintiff's motor strength and sensory were both intact on December 23, 2005. (Tr. 348-50). Finally, none of Plaintiff's doctors advised her to limit her activities or otherwise noted findings that were inconsistent with the ability to perform sedentary work.

Inconsistent with her testimony, Plaintiff advised doctors in 2009 that her lymphedema had a "slow, gradual onset" beginning in 2002. (Tr. 646). Equally as inconsistent, she denied any pain and doctors observed no edema, full range of motion and no deficit in motor strength for all extremities on October 21, 2007 — 4 months after her date last insured. (Tr. 320, 646). Dr. Francis similarly found full range of motion and muscle strength, as well as good grip strength bilaterally when examining Plaintiff in 2008. (Tr. 463, 465).

Further supporting the RFC, non-examining consultant Dr. Timothy Honigman reviewed the record on January 7, 2009 and found Plaintiff capable of performing the full range of light work "both prior to [her] DLI [of] 3/31/07, and currently." (Tr. 467-75). The ALJ, as Plaintiff complains, did not discuss this evidence. But given that Dr. Honigman's RFC specifically addressed the period before Plaintiff's date last insured and found her capable of performing work at an exertion level higher than the RFC, any error by the ALJ was harmless. Dr. Adeboye Francis examined Plaintiff on December 23, 2008. (Tr. 461-65). During the examination, Dr. Francis observed lymphedema of the left upper extremity. (Tr. 463). Again, this was the first finding of lymphedema since 2002. (Tr. 458). Otherwise, there was full range of motion in all of her joints, normal gait and coordination, normal sensation, no atrophy, normal muscle tone and strength with good grasp and grip strengths. (Tr. 463). Dr. Francis' report addresses Plaintiff's

condition at the time of examination and therefore was not directly relevant to the adjudicated period. As such, no error occurred when the ALJ failed to discuss this report.  Moreover, given that Plaintiff alleged her condition progressively worsened beginning in 2002, Dr. Francis' report further supports the ALJ's RFC determination, as it indicates Plaintiff's conditions were not as severe as alleged more than a year and a half after March 31, 2007.

Considering the record evidence, the ALJ's failure to explain what weight, if any, he gave to Dr. Rathbone's MSS and the reports of the state agency consultants was harmless error, and the RFC is otherwise supported by substantial evidence.

**C.      Consideration of Obesity**

Plaintiff finally argues that the ALJ failed to adequately consider her obesity when making his RFC determination, as is required by the Social Security Ruling 02-1P, 2002 WL 34686281 (Sept. 12, 2002).  Plaintiff believes the ALJ simply recited the regulations instead of adequately considering the combined effects of her obesity and other severe impairments.  Given the limitations alleged in both her testimony and Dr. Rathbone's MSS, along with her morbid obesity, Plaintiff suggests "it is difficult to comprehend how the impairment paired with the weight [(273-290 pounds)] would *not* be seriously limiting of mobility." (R. Doc. 10 at 11).  In Plaintiff's view, "the ALJ cannot simply pay lip-service to the regulations and thereby meet his burden as impartial trier of fact and law." (R. Doc. 10 at 11).

As an initial matter, the Court has already determined that the ALJ's RFC finding is supported by substantial evidence, and that substantial evidence supports a finding that both Plaintiff's testimony and Dr. Rathbone's opinion were entitled to little weight.  And so, the limitations cited by Plaintiff that, when combined with her morbid obesity would indicate

impaired mobility, are not supported by the record. For that reason, the ALJ did not consider those limitations along with Plaintiff's obesity to find Plaintiff suffered from impaired mobility.

Second, Plaintiff is incorrect that the ALJ "simply pa[id] lip-service to the regulations." (R. Doc. 10 at 11). Instead, the ALJ considered the record evidence as a whole, along with the guidance provided in SSR 02-1P. (Tr. 25). The ALJ began by observing that SSR 02-1P provides:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

SSR 02-1P, 2002 WL 34686281, at *6 (Sept. 12, 2002). The ALJ then specifically reasoned that:

> [T]he claimant has failed to demonstrate specific limitations of any kind related to obesity. None of the other limitations referenced by Social Security Ruling 02-1P appear to be present in this case. The evidence contains nothing limiting the claimant's ability to manipulate objects with the hands and fingers. Nor did there appear to be an inability to perform routine movement, to function adequately in a social setting, or to tolerate extreme heat, humidity, or hazards. There is no evidence that the claimant had sleep apnea or was excessively fatigued due to obesity.

(Tr. 25). Plaintiff does not offer any argument or point to any evidence that would refute these specific findings. Therefore, the Court finds the ALJ adequately considered the effects of Plaintiff's obesity combined with her other impairments that were supported by the record.

## V.  CONCLUSION

Ultimately, the record as a whole does not support the degree of limitations alleged by Plaintiff between 2005 and 2007. The Court therefore finds that substantial evidence supports

the ALJ's finding that Plaintiff could perform the full range of sedentary work and was not disabled on or before March 31, 2007.  Therefore,

**IT IS RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that Plaintiff's appeal be **DISMISSED with prejudice**.

Signed in Baton Rouge, Louisiana, on February 13, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**